57 CCPA
**In the Matter of the Application of Reedus R. ESTES.**

**Patent Appeal No. 8249.**

United States Court of Customs and Patent Appeals.

Feb. 19, 1970.

Fred S. Lockwood, Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill., William H. Magidson, attorneys of record, for appellant.

Joseph Schimmel, Washington, D. C., for the Commissioner of Patents; Leroy B. Randall, Jack E. Armore, Washington, D. C., of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN, LANE, Judges and McMANUS, Chief Judge, Northern District of Iowa, sitting by designation.

LANE, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals which affirmed the rejection of all 14 claims in appellant's patent application serial No. 212,467 for "Amylose Solutions," filed July 25, 1962. We reverse the board's decision.

The invention here is a process of preparing amylose ethers. Claim 1 is illustrative:

1. A process of preparing amylose ethers having a low level of salt contamination, which comprises the steps of providing an aqueous solution of amylose consisting essentially of from about 2 to 30 parts by weight amylose and from about 98 to 70 parts by weight water, and reacting said amylose with an etherifying agent in the presence of from 0.01 to 0.25 mole of alkaline catalyst per mole of amylose, wherein the reaction is initiated at a temperature above the gelation temperature of the aqueous alkaline amylose solution.

Claims 2–12 inclusive are dependent upon claim 1 and recite specific etherifying agents, neutralizers or temperatures. Claims 13 and 14 define continuous processes.

In his specification appellant discloses that ethers of amylose are useful as packaging film. Amylose is one of the two major fractions of starch. The specification discusses various prior art methods of etherifying amylose, which may be broadly categorized as the suspension approach and the solution ap-

proach. The specification discusses the relative advantages and disadvantages of each approach, and the solution approach is said to be desirable in that it produces a more homogeneous product. Appellant then discusses in detail the difficulties attending etherification by solution techniques, specifically referring to British Patent 869,192 (hereafter called Avebe) the complete specification of which was published May 31, 1961, more than one year prior to appellant's filing date. Avebe discloses that amylose can be dissolved in water at room temperature if an alkaline substance, such as NaOH, is mixed with it. This same alkaline substance is used by Avebe as a catalyst and as a stabilizing agent to keep the amylose in solution, in addition to its function as a solubilizing agent. The stabilizing function is required in order to overcome the phenomenon known as retrogradation, which is the known tendency of amylose to come out of solution and form a water-insoluble gel when its temperature is lowered or when the solution is left to stand for any significant time. Since Avebe uses the alkali for the three functions of solubilizing, stabilizing and catalyzing, the reference uses a large amount of alkali relative to the amount appearing in appellant's claims. While there is some dispute between the parties as to the exact concentration of alkali disclosed by Avebe, it is at least twice the upper limit of alkali concentration recited in appellant's claims.

Appellant's main object is to produce a relatively salt-free product. Appellant has submitted evidence that the product will be degraded in clarity if it contains more than about 0.25 moles of salt per mole of amylose ether. To accomplish this objective of lowering the salt content of the product, appellant uses alkali as a catalyst only, thereby allowing a smaller concentration of alkali to be used. Since it is the alkali which, upon subsequent neutralization, produces the salt, the salt content of appellant's product is correspondingly lowered. Avebe, also recognizing the undesirability of salt, sought to remove it from the product by washing techniques, but states that such techniques are usable only where the ether is of a degree of substitution not exceeding 0.20. Appellant's process requires no washing out of salt, and consequently his product is not so limited in degree of substitution.

Appellant, according to the specification, recognized that he had to contend with the solubilizing and stabilizing problems if he reduced the concentration of alkali. The prior art knew that amylose could be dissolved in water at a neutral pH if a sufficiently high temperature (around 125° C) were used. To obtain such a temperature without evaporating the water, an autoclave or pressure cooker could be used. Appellant also states in the specification that the October 1958 issue of Cereal Science Today contained an article showing in graphic form the gelation or retrogradation temperatures for amylose solutions of varying concentration. These temperatures are significantly below the dissolving temperature. Appellant combined these known scientific facts and concluded that if the etherification reaction were carried out at a temperature above the gelation temperature, the amylose solution prepared without alkali by heating would not have a chance to retrograde, and hence both the salt problem and the stability problem would be solved. In subsequent experiments appellant discovered that if the reaction were initiated at a temperature above the gelation temperature, the reaction would proceed so quickly that the temperature could be lowered during the reaction to a point somewhat below the gelation temperature shown in the abovementioned article.

The examiner rejected all the claims under 35 U.S.C. § 103 based on Avebe alone. It was the examiner's position essentially that appellant had merely optimized the teachings of Avebe. The examiner believed that Avebe used sodium hydroxide as a dispersing agent and a catalyst, and that it was obvious to use less sodium hydroxide if its only func-

tion were to be as a catalyst. The examiner's original answer does not mention the stabilizing problem or appellant's recited temperature limitation as an answer to that problem. The examiner's supplemental answer referred to the stabilizing problem in connection with Avebe as follows:

> As to the use of NaOH as a dispersing agent the Examiner has assumed that the alkali not only initially solubilized the amylose but acted to retain it in solution. This is not a tenuous assumption since any means for solubilizing amylose which resulted in amylose precipitation could hardly be an effective dispersing means.

This statement is correct but fails to consider the effect on obviousness of appellant's reduction of the alkali to such a level that it could not function as a stabilizer. As to temperature the supplemental answer states the examiner's position as follows:

> It is the Examiner's contention that if one desired to solubilize amylose without a large amount of alkali it would be obvious to solubilize the amylose by way of temperature, i. e. a temperature above the gelation temperature of the aqueous alkaline amylose.

From this comment it is still unclear whether the examiner recognized the different problems of solubility and stability. The specification is clear that the dissolving temperature and the gelation temperature are two different things, a fact most important in judging the obviousness or unobviousness of appellant's invention. The examiner also failed to mention the greater degree of substitution achieved with appellant's process.

The board's decision and opinion in this case, far from supplying what was missing in the examiner's position, proceeds on incorrect legal premises and fails to consider the results achieved by appellant because they are not recited in the claims. The board refused to consider the lower salt concentration achieved by appellant's process because "these claims do not remove [the salt]." There is no need to recite the result of lower salt, since it will inherently occur through the recited limitation on alkali concentration. Similarly, the board refused to consider the clarity of film and the degree of substitution obtained by appellant's process, because the claims were not directed to a process yielding a film and did not recite the degree of substitution. There can be no doubt from the record that these advantages accrue from the claimed process, and it is not required that they be recited.

Thus, neither the examiner nor the board has given any basis for the conclusion of obviousness of the process claimed. The decision of the board is therefore unsupported and must be reversed.

Reversed.